McBRIDE, Judge.
Plaintiff, a subcontractor for the plumbing work, recovered judgment against the principal contractor for $6829.83 due on the subcontract. However, plaintiff has appealed from that part of the judgment which dismissed its personal right of action against the owner for the amount of its claim and disallowed its asserted lien and privilege on the property on which the work was done.
Shortly after acquiring 1415 Esplanade Avenue, New Orleans, in February, 1962, Miranne and Harris, Inc., as owner, entered into a verbal and, of course, unrecorded contract with defendant, E. M. Gibbens, Inc., contractor, 'for the renovation of said building and its conversion into ten apartments. The contract price was $25,-000. Plans and specifications were prepared by an officer of Miranne and Harris, Inc. Work commenced at once.
About March 1, 1962, E. M. Gibbens, Inc., the contractor, entered into a verbal subcontract with plaintiff whereunder plaintiff, as subcontractor, undertook to perform all plumbing work for $6602 as per its written proposal. Plaintiff was to furnish the necessary labor and materials. To be furnished and installed were two 65-gallon, glass-lined water heaters and vents. Plaintiff’s proposal provided:
“All work shall be in accordance with the rules and regulations of the Sewerage and Water Board and inspected by same, also the Department of Regulatory Inspection for gas.”
The contractor was paid by the owner in full for the job, the last installment of $9000 being paid August 2, 1962. E. M. Gibbens, Inc., fully completed its work in December, 1962, and, by mutual agreement with the owner, left the job. The owner was satisfied with the result and took possession of the premises immediately. The contractor failed to pay plaintiff. The lien plaintiff asserts against the building was filed in the mortgage office May 31, 1963. This suit ensued.
The defense of the owner is that whatever rights plaintiff may have had to a lien on the property and a personal claim against it, was lost by the failure to seasonably record the lien.
Plaintiff contends that it performed its last work on April 11, 1963, when it installed vents on the two gas water heaters as per the terms of the subcontract. The heáters were vented by the connection of metal flues to the tops thereof and by the running of the flues through holes to the outside of the building so as to permit the escape of gases and fumes generated by the heaters into the air. Plaintiff argues that its lien was filed timely, i. e. within sixty days of the last performance of all services or labor upon the property.
R.S. 9:4812 provides in part as follows :
“When the owner, * * * undertakes the work of construction, improvement, repair, * * * for which no contract has been entered into, * * * then any person furnishing service or material or performing any labor * * * may record * * * *263 a copy of his estimate or an affidavit of his claim * * * which recordation, if done within sixty days after the date of the last delivery of all material upon the said property or the last performance of all services or labor upon the same, by the said furnisher of material or the said laborer, shall create a privilege upon the building * * *. Any person furnishing service or material or performing any labor on the said building * * for a contractor or sub-contractor, when a contract, oral or written has been entered into, but no contract has been timely recorded, shall have a personal right of action against the owner for the amount of his claim for a period of one year from the filing of his claim, * *
During January, 1963, some water pipes were damaged by a freeze and required replacement, the work being performed by another plumber at the owner’s expense. During February, March and April, 1963, air conditioning was installed, and the premises were equipped with carpets, draperies, appliances, furniture, etc., none of which items were included in the contract between the owner and E. M. Gibbens, Inc., or in the subcontract between Gibbens and plaintiff. All apartments had electrical service by March 28, 1963. The initial apartment occupancy took place about mid-May, 1963.
At the time the contractor left the job and the owner accepted the job in December, 1962, plaintiff had, to all appearances, completed its undertakings under the subcontract. All plumbing had been installed in accordance with the agreement, and the two water heaters were in place and connected with the respective water and gas pipes. Plaintiff’s workmen did nothing in the premises until the heaters were vented on April 11, 1963. In other words, a period of four months elapsed during which time no one representing plaintiff as much as entered the premises. The contractor and the owner believed that all plumbing work under the subcontract had been fully performed. All that remained was the subcontractor’s duty to furnish the permit from the Department of Regulatory Inspections authorizing occupancy of the building.
As aforesaid, plaintiff had agreed to perform its subcontract work in accordance with the rules and regulations of the Sewerage & Water Board and the Department of Regulatory Inspections. In December, 1962, plaintiff made applications to said municipal departments for inspections of both the water and gas installations ; the water installations were inspected December 19, 1962, and approved and the water was turned on. The gas installations were inspected January 2, 1963, by the Department of Regulatory Inspections but failed to merit approval. Plaintiff was notified thereof by the Department and undoubtedly had cognizance that approval had been withheld for the reason vents had not been installed on the two 65-gallon water heaters. Plaintiff made no mention of these facts to the owner of the building or to the contractor, who had no knowledge thereof.
The owner was at all times led to believe by plaintiff that it had obtained approval of the plumbing work and that it had secured the occupancy permit. It might be mentioned in passing that up to the date of the trial, the owner had not received such permit from plaintiff.
Mr. Miranne, president of Miranne and Plarris, Inc., testified:
“Q. Did you go to the premises at all during the course of the renovation ?
“A. Yes, I did, and I went to the premises during the renovation the last time I recall going to the premises when Mr. Gibbens said that his work was completed under his contract. That was about the middle of December ’62.
*264 “Q. Did you inspect the premises at that time ?
“A. Yes, I did.
“Q. Did Mr. Gibbens or anybody from E. M. Gibbens, Inc. appear at the property 1415 Esplanade thereafter ? I’m talking- about after mid December of ’62 for any repairs, renovations?
“A. To my knowledge, no, because Mr. Gibbens’ work was completed.
“Q. Did you ever have any telephone or other discussions, did you ever discuss this matter with Louisiana Plumbing and Heating, Mr. Flynn, or any representative?
“A. Yes, I did. I think on three separate occasions, if this is Mr. Flynn here.
“(By Mr. Flynn) : Yes.
“A. I didn’t know Mr. Flynn except by telephone, but I did know your partner, whoever is the short fellow, was the gentleman that works for you.
* * * H' * *
“A. Well I mean I never met Mr. Flynn personally, but on the telephone I discussed with Mr. Flynn. At the completion of the job I asked Mr. Gibbens, I wanted all the permits then. Fie said they had all the permits. I said I wanted them because I had to apply for a loan at the National Bank of Commerce. I wanted to to get appraisal made and everything else. They said they had all the permits. And then I talked to Mr. Flynn. Following that Mr. Flynn told me that he had the final inspection, that he would send it to me.
“Q. What was the date of this conversation approximately?
“A. I think that was in January of ’63.
“Q. You say you discussed this three times with Mr. Flynn?
“A. Correct, and then Mr. Flynn call me back again because Mr. Flynn, then I understood Mr. Flynn had not been paid and then Mr. Flynn and I discussed the question of him getting his money and I told him I would help him get his money. * * *
“Q. Did you discuss the permits at any time with Mr. Flynn ?
“A. I discussed the permits at all times with Mr. Flynn because he kept telling me he had them but wouldn’t send them.
“Q. Have you ever received a final inspection permit from * * * ?
“A. No, Sir, I never have received it.”
The trial judge believed this testimony, and we see no reason why we should not accept it. Mr. Flynn never denied that in February, 1963, when Mr. Miranne called him by telephone regarding the permit for occupancy that he assured Mr. Miranne that this permit was available and would be supplied forthwith. There can be no doubt that in February, 1963, plaintiff considered its job finished and was endeavoring to enlist the aid of Mr. Miranne in the matter of collecting from the contractor. If plaintiff did not believe its work was finished, why was it demanding payment of the subcontract price and extras? And why, if plaintiff did not think it had completed its subcontract, would it apply for inspections of the plumbing installations? It may be that plaintiff overlooked the venting of the water heaters. But be that as it may, plaintiff acted as though it had fulfilled its undertakings and represented as much to the owner and contractor. The two latter had no inkling there remained anything more to be done.
The Department of Regulatory Inspections caused a second examination of the *265 water heaters to be made March 13, 1963, and again approval was denied for the same reason as before, there were no vents. Miranne and Harris, Inc., had no knowledge of said second inspection or the result thereof.
It was only on April 11, 1963, that plaintiff sent its mechanic to 1415 Esplanade Avenue for the purpose of tightening the bolts on a loose toilet bowl and venting the water heaters. Both items of work required no more than two hours of the mechanic’s time. The owner knew nothing of the venting of the heaters.
We readily agree with the trial judge, in light of the circumstances surrounding the matter, that the lien was attempted to be perfected without the sixty-day lien period as contemplated by the statute.
The jurisprudence has established that the sixty-day period set forth in the statute begins to run on the date when the building is treated or considered as complete, (Cain v. Central Plumbing and Heating Company, La.App., 85 So.2d 376) even though subsequently minor repairs, corrections or additions to the work are performed (Hortman-Salmen Company v. White, 168 La. 1067, 123 So. 715; Romero & Sons Lumber Company v. Babineaux, La.App., 151 So.2d 714; Bailey & Sons v. Western Geophysical Co., La.App., 66 So.2d 424).
In the instant case, everyone thought the building was complete and considered it as such and neither the contractor nor the owner had any reason whatsoever to suspect that the job was anything other than as represented by the contractor and subcontractor, that is, that the building was fit for occupancy, which took place in December, 1962. The owner had further assurances that the work was complete in February, 1963, when Mr. Flynn promised to deliver the occupancy permit. But why plaintiff would make such promise is beyond comprehension when it most certainly must have known that the gas installations remained unapproved.
It may well be that when approval of the gas installations was not forthcoming after the January 2, 1963 inspection, plaintiff, who had not been paid by the contractor, designedly delayed the performance of a minute portion of its work in the hope or belief that it could record its lien within sixty days from the time it saw fit to supply the vents, thus extending the lien period. A statement made by Mr. Flynn, plaintiff’s president, cannot escape notice:
“Now I could take ten years to finish the job if I wanted to. * * *”
Under the unusual circumstances attending this case, our opinion is that a furnisher of materials or labor has not the right to choose when his lien period should start by purposely - delaying completion of a small particle of the work which the owner had not the remotest inkling was unfinished. It is too well-known to necessitate citation of authorities that under the law of Louisiana lien statutes are in derogation of common rights, must be strictly construed, and must not be extended beyond their precise terms. Furnishers of labor .and materials may not have an indefinite lingering time within which to record liens to the possible unreasonable displacement of the rank of mortgages and other subsequent claims against the property. Cain v. Central Plumbing and Heating Company, supra. The sixty-day lien period began from the time the parties considered and treated the structure as being complete. Whether said time be December, 1962, when the owner took possession, or in February, 1963, when the subcontractor last promised to deliver the occupancy permit, the rec-ordation of the lien came too late to be effective.
For the reasons above assigned, the judgment appealed from is affirmed.
Affirmed.